Good afternoon. May it please the court, counsel? My name is David Anthony. I represent the petitioner-appellant John Bejarano. I would like to reserve seven minutes for rebuttal if I may. All right, watch your clock. The district court and this court certified four issues for review. Two issues pertain to a claim of ineffective assistance of trial counsel at the sentencing hearing. Also, there's a certified claim of ineffective assistance of counsel on direct appeal. And then finally, a claim that the Nevada Supreme Court failed to provide close appellate scrutiny of Mr. Bejarano's death sentence after invalidating two statutory aggravating circumstances. All of these claims have something in common. Are you, does that mean you're not going to focus on the juror? Because that was also certified, right? The juror that was disqualified? Your Honor, my understanding from the COA was that it encompassed ineffective assistance of direct appeal counsel. And one of the arguments of ineffective assistance of direct appeal counsel was the issue of counsel not moving to strike, sorry, not challenging the strike of a juror for cause. I'd like to start with the claim of ineffective assistance of trial counsel at sentencing. One of the things the state acknowledges is that the district court's primary basis was its ruling that Mr. Bejarano did not suffer prejudice as the result of counsel's ineffective assistance. The state agrees, and we concur, that if this court disagrees with the district court's resolution of the prejudice issue, then it would be appropriate to remand the case back to the district court for further proceedings. Go ahead. Why don't you tell us why there was prejudice? There was prejudice for a couple reasons, Your Honor. One of them is if we start by looking at the The first thing that the district court found was that the jury here was not informed of the deprivation and instability that plagued Mr. Bejarano's childhood and adolescence. Second, the district court found that the lay witnesses, the good character witnesses, could have softened at least one juror's perception of Mr. Bejarano. The reason we believe that the court should find prejudice on the current record is because the district court proceeded to make a series of errors in misapprehending certain facts in the record and also making credibility determinations that could not properly be made without allowing the jurors Counsel, even if that's true, even if the district court did make errors, don't you have to establish that the outcome would have likely been different but for those errors to make a successful showing of prejudice? Yes, Your Honor, although I would add a caveat, which is that in the procedural posture that we're in, the pertinent standard is whether Mr. Bejarano has made a colorable claim of prejudice. So one of the things that we've complained about is that the district court's order was worded in the terms of whether Mr. Bejarano could achieve ultimate relief rather than the standard that the court should apply, which is whether there was a colorable claim. Help me understand that because aren't we deciding whether he actually suffered prejudice at this point? You are, Your Honor, but you're doing it in a procedural posture. The procedural posture here is one where all of the credibility findings and all of the determinations were made in the absence of a hearing, where no witnesses were allowed to testify, where there was no ability to reliably sort out the facts. What is that standard of review? The standard of review, Your Honor, is de novo. This was a claim that was not adjudicated on the merits in state court and therefore it is reviewed de novo by this court. Talking about the errors in the district court's decision, one of the glaring errors was that the district court failed to apprehend the evidence of physical abuse in Mr. Bejarano's background. Mr. Bejarano reported suffering physical abuse at the hands of his alcoholic father to almost all of the mental health experts who saw him. Those instances of physical abuse were specifically corroborated in juvenile records from 1973 and 1974. But I thought that, with regard to that specifically, that they, Specio, wasn't that the counsel that was addressing this? Yes. He actually did some investigation to put on some corroborating witnesses for that, but decided that overall they were going to hurt Bejarano. Is that not true as to these claims or is that other issues? That's not true as to these claims, Your Honor, and I think that... So, counsel, when you say these claims, what particular claim are you talking about right now? Right now we're talking about claim 2A, which is the claim of ineffective assistance of trial counsel at sentencing. And what I would... Is this the failure to investigate and present mitigation evidence? Yes, Your Honor. Now isn't this procedurally defaulted in some way, a long way, because he didn't put on that evidence before the state court? Your Honor, our argument is that it is not procedurally defaulted. One of the requirements to impose a procedural default is that the default be adequate. And here, there is no dispute between the parties or the district court that the procedural default that was imposed was not adequate to bar federal review. That's the we would argue no, that it was not defaulted, and yes, that it is appropriately before the federal court for a decision on the merits. Counsel, didn't trial counsel put in some of the juvenile records and he decided which ones to put in and which ones to not put in? Your Honor, I think the record is maybe a little bit unclear as to what exactly, what type of a deliberative process that Mr. Specchio used. Well, first, he put in some of the juvenile records. Is that correct? Yes, Your Honor. He took a, I guess a smattering of juvenile records and put them in front of the jury. I would argue that the explanation for those records was bare to almost non-existent. The entire explanation of counsel putting those into the record was limited to a single paragraph. So wait, is your argument that Specchio did not adequately look at what records he should put in or that once he put them in, he didn't explain adequately to the jury why they were relevant? Both, Your Honor. What we would argue is that if the court looks at the universe of juvenile records, there are a smattering of records that at least in my own estimation are what I would consider to be a mental health goldmine. There are psychiatric records. There are psychological records of Mr. Bejarano as a juvenile and as an adult. And when Mr. Specchio was questioned about this issue in the first post-conviction proceeding, he offered the justification that the records were too old. I don't know what others think about that explanation, but to me that strikes me as a frivolous explanation. The fact that Mr. Bejarano was the age he was means that records that pertain to him will be old, but they were very valuable. There were Counsel, the record appears to reflect that those records were mixed. There were some matters in the records that would be helpful to your client, but there were also some matters in those records that would be detrimental to your client. So how can we say that there was ineffective assistance of Counsel if Counsel went through the records and then selected the ones that he wanted to put before the jury? Your Honor, the response is that the records that he put in were the detrimental ones. The records that he put in were the ones showing the status violations that Mr. Bejarano committed. So in my opinion, the bad records got in front of the jury. What didn't get in front of the jury was the good ones. And what were the good ones? The good ones, Your Honor, were the psychiatric evaluations. The good ones were the ones that evaluated Mr. Bejarano's IQ. The good ones... But isn't that his IQ was always above, it was in the normal range? Your Honor, I... You point me to any that were below the normal range? I know that the ones that were done by Sister Mary, I believe that was in 1974, that put Mr. Bejarano's verbal IQ in the intellectually disabled range, which is precisely the reason why those records were so valuable. But those that could be challenged because the, I think there were at least three experts who said that his IQ was in the low to average range. Your Honor, I think if we look very closely at those records, what they show is they show a disparity. They show a disparity between verbal and performance IQ. We argue that when you assess prejudice, that type of evidence is very probative of neurological damage because we're talking about an extremely low verbal IQ. Verbal IQ is how people socialize. It's how people relate to the world and those around them. So what I would argue is that the evidence of verbal IQ in particular being very low is the same reason why they would have been very mitigating. But counsel, the experts, I think unanimously diagnosed him with antisocial personality disorder as a result of looking at all of those records. So why wouldn't that be a reason for the, for trial counsel not to put those records in because all of it was going to come in. A part of it came in. All of it was going to come in. And that diagnosis can be can show incorrigibility. So how can we say that it was ineffective to keep those out? Your Honor, our position, particularly if you're looking at the report of Dr. Etcoff, is that the evidence of personality disorder is only a sliver of the relevant mental health evidence that could have been presented for Mr. Bejarano. This Court's decisions, and I would refer this Court to the Lambright case, acknowledges that evidence of personality disorder can be presented in a way that is mitigating to a sentencing jury. Well, but that's, I mean, yes, it can be. But we've also got cases that say it's a double-edged sword that Judge Rawlinson was referencing. So that seems to be a tactical decision that would make ineffective assistance for counsel under those circumstances. The first argument, Your Honor, is that I don't think that the evidence, or I don't think the record supports that Mr. Specchio made such a strategic decision. Mr. Specchio was not aware of the psychological evaluations that were done by Dr. Dixon that were commissioned by prior counsel. So I would push back on the suggestion that he made a strategic decision. I thought he said that he spent several weeks. Where in the record is it that he wasn't aware of Dr. Dixon's? Because I thought he and prior counsel had several weeks where he reviewed all of their records. I mean... Well, Mr. Specchio did testify that he reviewed records. I think what I would point the Court to is the deposition of Mr. Specchio in 1992, when he was first confronted by Federal Habeas Council, with the fact that he hadn't followed up with Dr. Dixon. If you look at the timeline, it  That's a different issue. I mean, you mentioned that he hadn't followed up with Dr. Dixon. That's a different issue of whether he'd reviewed the report. Agreed, Your Honor. But it's our position that before making a tactical decision, there has to be a reasonable investigation beforehand. And our position is... And that can never happen on the papers? He can't read it and say, I read this report. It's got good stuff in it, and it has some negative stuff. I'm making a decision that I'm not going to do this. You think he has to call and talk to every expert and follow up on it? I think a reasonably effective attorney, particularly when we're talking about Dr. Dixon, I think a reasonably effective attorney needs to consult with the experts that prior counsel already put in line to investigate the case. I don't think that we can just say on this record that this evidence of personality disorder is so frightening that we just can't possibly talk to a mental health expert about it. In fact, in the Lambright decision, that's exactly what the court said counsel should have done. It should have asked the mental health expert about the diagnosis. What I would say about the diagnosis is that if you look at each case, each case has its own facts. What I would say is that in the cases that Your Honor's talking about where personality disorder was shied away from, there were severe and extreme behaviors that would tell an attorney reviewing those records that this wasn't something fruitful to pursue or to develop further. In Mr. Bejarano's case, the evidence is pretty light. If you look at his adolescent years, he doesn't have a contemporaneous diagnosis of conduct disorder. In fact, what's his criminal history here? The only criminal history he had before the age of 18 was one count of a car theft. That is very, very limited compared to some of the cases that this court relied on. To say that personality disorder was too dangerous to get into further. The other thing that I would say about personality disorder is that because the juvenile records for Mr. Bejarano were so extensive, they helped explain the cause. They could explain the cause of the personality disorder in a way that could have been mitigating to the jury. What could they have done? Dr. Edcoff gives us the roadmap. They talk about a boy who was separated from his mother and his father and his family and put into a foster care system who has a very, very low limited IQ, who has a very deficient verbal ability, so it impedes his ability to socialize with others. It caused him to be avoidant, which is one of the flavors of personality disorder, which also makes him very prone to alcoholism. If you look at the severe learning deficits, if you look at the trauma in his background, the physical abuse that the district court missed, the rejection that he faced, his only maladaptive behavior was escaping from foster homes to find his family. He's got a history of abandonment and depression. All of these deficits are deficits that the district court missed. Dr. Edcoff was able to look at and to say, this is why Mr. Bejarano became the way that he was. In fact, but I thought a lot of that that you just mentioned actually was in some form given to the jury. What I'm trying to parse out of my mind is, what are the specifics? Which of those examples that you just gave, was there was nothing before the jury at all? I would say, Your Honor, if we look at, I believe it's Defense Exhibit 42 that was admitted by Mr. Specchio. If you look at the part of the closing argument where he refers to those documents, and if you look at the universe of those documents, I don't think it even scratches the surface of what was available in those files. Even if these documents were in the record, some of what you said, it wasn't focused on or argued by counsel, so we can't therefore consider it as being presented to the jury. Well, I guess what I would say, Your Honor, is that counsel is an advocate, and counsel has a responsibility to direct the jury to what's helpful in a batch of records. It's not enough to simply say, he had a difficult life, this occurred in the course of 20, 30 seconds of penalty hearing closing argument, and then to say that counsel properly discharged his sentence, he didn't even refer to two of the three exhibits. One of the exhibits was an honorable discharge from the military. The honorable discharge said that he got a good conduct award when he was in the Marines. Wouldn't that undercut some of the antisocial behavior that you're saying he should have presented? Oh, I think that his good conduct in a structured setting does push back against the antisocial personality disorder. That's why I'm saying that every person is unique. You can't just look at a diagnosis like that and not look further when this is all you have to work with is counsel. And absolutely I would say that, yes, Your Honor, he, Mr. Bejarano, did very well in structured settings. He did very well when he had systems of support. So he did very well in the Marines. He did very well in drug and alcohol rehab. He also did very well when he was in the community after he was released from prison, and he met with Reverend Ben Wenke at the Boise Rescue Mission, and they provided him with a place to live. Well, may I just interject there? That, to me, is the greatest deficiency in the presentation and investigation by Mr. Bejarano. I mean, I don't know how losing contact with someone can be deemed tactical. I completely agree, Your Honor. The district court found that those two witnesses would have softened at least one juror's perception of Mr. Bejarano. That showed a period of time in his life where if he had a system of support, if he had people that cared about him and loved him, he could actually perform quite constructively in the community. Particularly, I mean, everything that Ben Wenke said about inviting Mr. Bejarano into his home with his daughter, and I think that's a very important point. I mean, the fact that he allowed his daughters to live with them, about them working together, about him referring Bejarano to Ms. Greathouse, an old woman whose husband had just passed away, and allowing him to live on her property, to have her husband's clothes, and to take care of her yard and her chores. I mean, I completely agree with Your Honor. To Judge Wardlaw's point, it's extremely aggravating that in the five months after Mr. Specchio's appointment, he's not taking those basic steps of calling these people and telling them, we have a trial starting in March of 1988. There's no evidence of contact from the time that Mr. Specchio is appointed to we go all the way to February, the last week of the trial, and then he gets to his investigator and says, hey, you should reach out to all of these people. Excuse me a second. So given that, assuming that, let's turn to the elephant in the room, which was Mr. Bejarano's own testimony at the penalty base. Yes, Your Honor. What I would say is that the court's decision in Strickland acknowledges that there are some errors by counsel that could cause a radical change in the evidentiary picture if counsel had performed effectively. I would submit to the court that this is one of those instances. Even in light of your client's testimony? Your Honor, the way I would address that is to say that what happened at trial with Mr. Bejarano simply replicated the fact that Mr. Bejarano is begging his attorney to contact the people that know him and that love him. What I would submit to the court to answer this question is... He didn't really have a huge problem with Specchio. He had a problem with the earlier ones. I just don't feel like Specchio let things drop as much as you're portraying it here when you look at the record. Well, Your Honor, the proof is in Mr. Specchio's instructions to his investigator in the end of February, which were too little, too late. And then Mr. Specchio filed a request with the court to have 15 witnesses ready for trial that was only 11 days away. So when you're talking about out-of-state witnesses, you can't be appointed for five months, not do anything, not tell out-of-state witnesses that we've got a trial starting in March of 1988, and then leave it up to your investigator to run everyone down two weeks before the penalty period. So Mr. Bejarano, you can't say that counsel was ineffective. I mean, he has a right to testify, and he said some pretty damning testimony. And you can say that that was a response to rejection, but that's the testimony that he gave. How are we supposed to address that? I mean, he said the only rational decision here is to sentence me to death. And if you knew everything I'd done, you'd give me five death sentences. What is a jury supposed to do with that? Your Honor, that's why I'm talking about how this court's precedents talk about how the evidentiary picture could be radically different. So you think he would, if some of this other evidence had been focused on or presented better, then Mr. Bejarano would not have testified in that way? Yes, Your Honor. I wouldn't say that. I wouldn't go that far. I would think that Mr. Bejarano would have been less destructive. And you don't need to listen to what I'm saying. That's what Dr. Etkoff opined in his report. He said that if people who cared about John had come and testified on his behalf, he would have had a reason not to be so angry and destructive, because it was simply replicating the evidence. And if he did, it wouldn't have been as destructive, because he would have had someone in his corner. He would have had someone standing up for him. And even if he had testified, Dr. Etkoff could have talked about and testified about why the stress of a situation, given his low IQ, was so high that he would tend to not understand court proceedings, like what's a penalty hearing, and how do you conduct yourself appropriately. So with mental health evidence, the evidentiary picture could have been radically different, Your Honor. I see that my time, that I have five minutes, I want to plug very briefly for the other claims and certainly answer any questions the Court has. One, the Nevada Supreme Court's prevent lawful arrest aggravator is invalid, because it's based on nothing but a felony murder. John Bejarano is the only client in Nevada who has the aggravator for that reason. Number two, the Nevada Supreme Court has held that a felony conviction is required to be under a sentence of imprisonment. Mr. Bejarano did not have a felony conviction. He had a misdemeanor conviction. So those aggravating circumstances should have been invalidated. And the last thing that I would say about the close appellate scrutiny claim is that Mr. Bejarano should not have been treated differently than other capital habeas clients whose mitigation evidence was considered by the Nevada Supreme Court. And whatever this Court says about that, this Court today has an obligation to consider the cumulative effect of the evidence, which is the absence of statutory aggravating circumstances and the mitigation evidence that should have been considered. And with that said, I will reserve the rest of my time. I'd ask the Court to vacate, or remand with instructions to vacate and grant the penalty, or alternatively to remand for a constitutionally adequate hearing on these claims. Thank you. All right. Thank you, counsel. Mr. Bongard? Good afternoon, Your Honors. Counsel. My name is Michael Bongard. I represent the Nevada Attorney General's Office and the respondents in this matter. I would ask the Court to affirm the District Court's resolution of the charges in this case, one of which receives, at least one of which receives, ad pedefrans. Can you address the legal standard of prejudice? Do you agree with counsel who said that he only needs to show a colorable claim of prejudice? With regards to the ineffective assistance of counsel? Yes. No, Your Honor, I believe the standard is the Strickland standard, and it's combined. It's a reasonable probability of a different outcome. Yeah, and I think he mentioned that at the end of his argument, so that's why I was just trying to parse out what your position would be, what the government's position would be on that. And you say he has to show a reasonable probability that the outcome would be different. Is that right? That's correct. So can I ask you about Nevada's state court procedure? I was very confused about how, so he filed his first post-conviction habeas petition, and even though, and this goes to the ineffective assistance of first PC counsel, so even though, I guess within five months there was evidence that could have been submitted on that claim, on those claims, it wasn't submitted, and then they tried to file a second federal, I mean state, petition where they could introduce this other evidence. I guess, at that time, Nevada, they could, petitioners could file for post-conviction relief under NRS Chapter 177 and a petition for habeas corpus. So why are these views viewed as first and second and not that he was entitled to do both? And why can we not consider that evidence? I'll start with the distinction between the two. At the time, there were two provisions. One was codified in NRS Chapter 177, the current standard is codified at NRS Chapter 34. And the whole idea behind creating NRS Chapter 134 was to create a single post-conviction opportunity for a defendant to raise all their claims. And yes, they overlapped, but in essence, they were basically the same provision. And specifically, the Nevada Supreme Court at one point, that was discussed by Joe DiPro, that Chapter 34 petitions were considered the same as a, at the time, as a 177 petition. And they additionally counted as the second or successive petition, as discussed in 34.810. So in the second state post-conviction relief petition, the state court dismissed 34 out of 35 claims as procedurally barred, because they could have been raised in the first one. And the third, the 35th, the IAC of the first PCR council on the merits. So what do we do with all that evidence? Can we consider it or not consider it? Your Honor, I think that Terry Williams v. Taylor is the case that provides this court the signposts that it needs. Because again, they have to get through 2254E2. And the definition of diligence was provided by the court in Williams. And they said that- It's 529 U.S. 34 is where they give the definition. Diligence for the purpose of the opening clause depends upon whether the prisoner makes a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court. And Your Honor, not only did the court provide that definition in Williams, but they also provided- they addressed three specific instances. One in which they found that petitioner was not diligent. Two in which they found the petitioner was diligent. And what it- to me, the linchpin of the difference between the two proceedings, or the showing diligence and not showing diligence, were there facts that supported the claim available in the record. And in the two cases where they found that there were facts in the record that supported diligence, was that they tried to raise the claims. And it was a claim of, I believe it was juror misconduct. I'm not sure I'm phrasing the claim correctly, but then the other one was potentially prosecutorial misconduct because the prosecutor didn't disclose the prior relationship with that potential juror. So they gave an evidentiary hearing, or remanded for an evidentiary hearing on those hearings, because there was evidence that something was there. In this case, Mr. Bejarano's counsel is represented that the evidence was there all the time, but counsel didn't do anything. And so what happened during that first proceeding was they raised a claim of ineffective assistance of counsel for failing to present mitigation evidence. But that focused solely- I shouldn't say solely, but primarily on the fact that they should have done more in developing mental health information with regards to Mr. Bejarano. So at that point then, we had the evidentiary hearing, we had the testimony from Drs. Nielsen and Howell, and we had a claim that was developed on the merits. To the extent that, and I'm not phrasing it correctly, but a number of times in their petition in the federal court, Mr. Bejarano said that this information was readily available. Counsel had this information, but didn't develop it. Counsel should have done something here, but didn't. And this was, just so I'm clear, this was first counsel, before Spezio, or it was Spezio? Well, it was that Spezio didn't develop the record and didn't use that information. So that should have been the light to first post-conviction counsel that I need to go into more on this as well. But what happened then, when they raised the second petition, as Judge Wardlaw was talking about, again, knowing that that information was already there and that they already had the first hearing, the second petition was found procedurally defaulted under state law, because of the fact that it could have been raised. And the information that was presented was considered by Judge Pearl when he decided the petition in federal court. But even though the claim was defaulted, and it was defaulted because at that point this court found that NRS 34.810 wasn't independent and adequate. But again, initial counsel should have known because of those sign posts that were there, but they didn't develop the record. So Judge Pearl said that, look, the only thing that they can do to develop the record based upon the fact that there was already information in the record is to satisfy 2254E2. And they haven't. They've never made any assertion that they could. So this is all focused right now, this argument on ineffective assistance of counsel for the post-conviction. It's not, I mean, there's a separate issue about post. I just want to make sure we're on the same page because there's a separate issue about ineffective assistance of counsel for not presenting the mitigating factors. Yes. But that's a different argument, right? Yes. Okay. Can you address, I mean, I don't want to cut it off if there's more questions on this, but could you address some of that? Because we heard a lot of information that opposing counsel has suggested should have been brought up. Can you help clarify what was brought up and to what degree it was actually addressed before the jury and they had a proper consideration of some of those mitigating factors? Okay. So now we're shifting from the post-conviction to the actual mitigating factors? Well, I mean, I am, unless there's more questions. We can come back to it. And I'll address this and be happy to go back. Well, I guess I was focusing on, it's kind of a conundrum, because in a way you could say that 2254E2 was satisfied because the evidence was presented to the second state court. It's just that the second state court didn't consider it and found the claims procedurally barred. But it was presented. I mean, that's the conundrum in this whole little messy part of this case, procedurally. Well, it was submitted to the court, but the court didn't consider it because they procedurally defaulted the claim. So I think that's where it falls in under 2254. You know, that Mr. Baird... I don't want to belabor it. I'm willing to move on to the question that Judge Nelson is interested in, but I would like you to focus on Virginia Great House and Ben Wendtke's potential testimony and Congress' failure to keep track of those witnesses and call them. And I believe that counsel was aware of Ms. Great House and there was a decision made not to call her because of the fact that... And I think the deposition showed that the information that she knew about Mr. Bairano, she learned from Mr. Bairano. So to the extent that she knew about his violent behavior, it was shaded by Mr. Bairano. You mean the violent behavior that he suffered? His prior convictions. Oh. The two prior battery convictions. But what was more concerning, I believe, was the fact that Ms. Great House didn't know or knew very little of the incident, the latest incident, the one that resulted in the conviction that he was under a sentence for at the time that he committed the murder in this case. On that point, is it required under Nevada law that it be a felony, not a misdemeanor? It says under a sentence of imprisonment. Is there any Nevada law on whether it's required that it be a felony or a misdemeanor? Well, I believe what it says is that if the person is under a sentence of imprisonment for a crime, that if it would have been committed in this state, it would have been a felony. So it does have to be a felony. It would have to be a felony in Nevada. In Nevada. And these happened where? Idaho. Were they felonies in this case? The first two were felonies, so that doesn't come into play. But with regards to the conviction he was under a sentence for. Because the first two felonies turned out to be, I don't know if I have the right terminology, expunged? They were vacated, right? I have that wrong. There were two prior felonies, which were the second and third aggravators, as discussed by the Nevada Supreme Court. But I think there were two that were also retroactively resolved. Based on future cases. Okay, I must be misremembering. I don't think so, Your Honor, because the four aggravators that they considered after invalidating the other two was he was under a sentence of imprisonment. And that is the one where it would either have to be for a felony, or a crime that if committed in Nevada would be a felony. So was the crime that was committed in Idaho, would it have been a felony in Nevada? Yes, sir. I apologize, I'm not 100% on that. I know the aggravator, there were a lot of changes to the aggravator. If the court wants, I can double check on that. At the time, right? At the time of sentencing. Would it have been a felony in Nevada? I'm trying to remember for sure if that's the way the aggravator was worded. But how does that play in? What do we do with this? If Bejanaro's counsel is correct that this was only a misdemeanor, does that mean this was an erroneous determination by the judge? No, Your Honor, because that was actually raised prior to the penalty hearing that there was a discussion on the record, is this, this is only a misdemeanor? And there was argument and the prosecutor said the aggravator says under a sentence of imprisonment. So you're saying this was discussed at trial and the trial judge ruled that it was a felony, but if he was wrong about that, that's a question of law. The trial, there was an objection to the use of the aggravator. The trial judge sustained the use of the aggravator. Right, so was there a ruling that if the crime that he was convicted of in Idaho had been committed in Nevada, it would have been a felony? And there was no discussion and that's why I'm, I may be thinking of a later version of an aggravator. Do you want to maybe submit a supplemental? I will on that, Your Honor. To clarify? Certainly. Thank you. Can you go back to Judge Wordlaw's question, though, about Wenke and just walk us through what happened there and why that, in your opinion, would not have been ineffective assistance at counsel? And my legal support for my argument is strictly going back and looking at counsel's conduct at the time that it happened. Counsel lost track of Mr. Wenke. What does that mean, lost track? Because, as I understand it, he had an investigator. The investigator did a lot of work. In fact, I don't think he would have known about Wenke other than hiring the investigator who went out and figured this out. Am I right about that? No, because...Beginaro gave a name. Right, and not only that, but Mr. Whalen had been the one that went and initially made contact with him. So how did he lose contact and what happened? Is there something he dropped the ball on diligence on this? Your Honor, I don't believe so because, again, back at the time of trial, there was no Facebook. There was no Instagram. There were no ways to do a quick search to try to find someone. The record shows that counsel tried, and I believe Mr. Specchio's representation, it was either during the post-conviction hearing or it was during the hearing while the jury was out deliberating on guilt, was that his counsel, when he told the investigator to get these people together, the comment was that he is somewhere between Idaho and Kansas City. And if I remember... And that was after he'd already talked to...Do you agree that that would have been, if he had gotten a hold of Wenke and had him testify, would that have been good mitigating evidence that would have been presented? Or was he a mixed bag like some of the others were? Because you talked about, it's a gray house that was a mixed bag. Is the same true of Wenke? Or Wenke would have actually...I mean, we had some pretty compelling statements here that Wenke certainly didn't feel, apparently, like he was harmful because he brought him in and housed him. Right. The record contained no... nothing that I believe could be construed as a strategic reason for not calling him. He just lost contact with him. So let me ask you, you say gray house was a mixed bag, but that's based on the fact that he had confided in her about his Well, there was a deposition done of her, and the prosecutor did bring up some information that she wasn't fully aware of the extent of the last crime that he committed, which included kicking out a window of a patrol car. But how did that make her be a mixed bag? It would have made her a mixed bag, or at least, and again, I can't put myself in trial counsel's shoes, but it certainly would have fit in with the information that Mr. Bayerano had an antisocial personality, that he...the morals... He didn't demonstrate it around her. That was the point of her testimony. Right. But then when he was away from her, and again, that could be considered part of the mixed bag. If he wasn't in and around her, he showed his other side. Those crimes came into evidence anyway, right? I'm sorry? Those crimes came into evidence anyway, right? Yes. So how could that further hurt him? Well, it would further hurt him from the standpoint that, and again, pointing to something that my opposing counsel said, that he functions well in a controlled environment, and talked about the good conduct in the Marines, but that's not necessarily true, because when he was in another controlled environment, which was in custody during trial, there were a number of officers that killed people. He was disruptive. He failed to follow directives. I believe one of the points was, or the testimony from, I believe it was the third law enforcement officer that testified, said he had asked Mr. Bayerano if he could switch bunks because his cellmate had injuries to his leg, and Mr. Bayerano said no, and not necessarily just no, but no in a way that showed indifference. Let me ask you another question. So the district court declined to rule on the grounds of deficiency. I think the district court judge was sufficiently troubled by some of these aspects, but he did go on to do a lengthy prejudice analysis. What's your best argument that even if counsel was deficient, there was no strict prejudice in this case? My best argument that there would be no prejudice, and I'll get back to the deficient conduct after I answer your question. We don't have to rule on deficiency if we agree. And correct. That's why I'm... I think the best evidence of that is the analysis that the district court did comparing Mr. Bayerano's case with a number of other cases, including Williams, Wiggins, and Rompillo from the U.S. Supreme Court, and I believe Rhodes was one of the Ninth Circuit cases that the court looked at. And the evidence, and I think there's two ways that Mr. Bayerano's case is different. Number one was that in the Supreme Court cases, trial counsel flat out just missed something. And in one of those cases, counsel didn't go back, in one of the Supreme Court cases, counsel didn't look at a prior conviction. And that prior conviction would have led counsel to find basically all the mitigation evidence that they missed about the person's the lack of the upbringing, the physical abuse. He talked to, trial counsel instead talked to a number of family members, but then there were other family members that this report would have led to that would have developed the information that the Supreme Court felt moved the needle and established prejudice. And in this case, you don't, number one, you don't have that I guess oops moment by defense counsel, because number one, he had that information. Number two, though, you don't have the prejudice because the information in those cases were of a nature and a type that obviously moved the needle for the Supreme Court. The district court in this case felt that the evidence from Dr. Nielsen and Dr. Howell that were developed at the first evidentiary hearing was evidence that could have been presented, but it was a double edged sword. And part of the problem was, number one, that both those doctors testified that the condition that Mr. Bayerano had wasn't curable. I believe one of Dr. Howell I think specifically said that it wasn't curable. Dr. Nielsen said that the literature on that is a mixed bag. But the other problem is those antisocial tendencies Bayerano exhibited those during his testimony, both at trial and opposing counsel. I mean, that is the pretty tough mountain to climb. His his his argument seems to be that that wouldn't have happened if some of this other evidence would have come in and Bayerano felt supported. How do we evaluate that? That's my question. I mean, at some point it feels like such an alternate universe. I don't know how you can put it all back together. Well, while they can suggest that he wouldn't have testified that way, Mr. Bayerano himself at both the hearing in between before the guilt phase came out, he specifically said, look, you know, whether it's someone good or bad, I want someone to state who's to say he wouldn't have gone back into the mode he expressly exhibited at the at the at the penalty. That's some of them. But Wenke and potentially Gray House seem to be in a little bit different category than than some of the other mixed testimony. Because I think you're right that some of those others speculate that Mr. Bayerano made a determination that it just it wasn't going to be helpful in the overall scheme. I don't think that's true of Wenke. That was at least that was not a determination made of Wenke. He just lost contact with him. But if if he had found Wenke and if Mr. Reverend Wenke had testified, he bet his the substance of his testimony was, look, during this two year period, he was but those were the same periods. Yes. Yeah. When he was in Idaho. But then on the other side, you've got you've got evidence that so we would have to I'm just looking for the legal test here. We would have to find that even if that evidence came in, I guess we just go back to what we originally said was there was there's a reasonable reasonable probability that reasonable probability that not only the outcome would have been different, but the outcome that he wouldn't have testified in that way. And therefore, the outcome would have been. Well, and again, and that's that was what the district court said. Look, even if I can consider this, I'm not sure I can, but I'm going to. Yeah, that it doesn't move the needle. You've got two people basically overwhelmed. The information was too overwhelming. If you look at the testimony of those two witnesses, the testimony of those two witnesses covers of the same period of time. They are right. But that's my point. What if they're I mean, at some point, wouldn't this have risen to a level where we would have had to consider it? What if there had been evidence that he lost track of for six different two year periods of his life? Would you be in making the same argument? Or are you saying this is just almost what to live in the roads case? You know, that was you know, that there was all this. He was a good person that was this period of time. But ultimately, the decision was made. Yes, even though he was a good period and even though it was for this period of time, you still got the universe of everything else. And just because he's a good person to these two people or in the case of Red Mulankey, you know, him and his family, that's not how he treats everybody else. And that's one of the things that the jury had to consider. And that's exactly what the argument was at the penalty phase was that this person, Mr. Bayerano, you know, in the institutionalized setting, he still makes threats. He's still a dangerous person. And so I don't, and that gets back to what, you know, the court did in both Wiggins-Rampilla and Terry Williams, and I shouldn't have said both, but in those cases, the evidence that Mr. Wanky, you know, would have said he's a good person and that Ms. Greathouse would have said that he's a good person doesn't move the needle like the omitted evidence in those three cases. And Judge Wardlaw, is there anything else you wanted me to touch on with regards to the post-conviction? Because I'd like to briefly discuss the appellate re-weighing. Oh, that was the next area I was interested in. And if you know, my math teachers always used to say, show your work. You're going to get extra credit potentially. This is what exactly the Nevada Supreme Court did. Even though their work in the words of Mr. Bayerano's attorney might be confusing, they showed their work. They showed what they did. And the Nevada Supreme Court says that the court has to do at least one of two things, re-weighing or harmless error analysis. And you can't throw up your hands and say it's just too confusing because they showed you exactly what they did. So if you are satisfied that they did re-weighing, that's enough. If you are satisfied that they did harmless error review, that's enough. The only way that there's relief is if they show that both re-weighing and harmless error was objectively unreasonable. And even in that case, you still have to apply BRACT. And my best argument that they did harmless error rather than re-weighing is the distinction between the two. Do you think they did harmless error? Yes. They explicitly said they were re-weighing? There were two points. One was at 1 EOR 92 and I believe the other one was at 1 EOR 108. They did harmless error. And the reason you can tell is because when a court does harmless error review, they step into the, they talk about the effect of the error on the jury. When you do an appellate re-weighing, they set aside everything that the fact finder did and do that re-weighing as if the jury wasn't there. And in this case, their conclusion was, and they prefaced the discussion with, he gets relief if we show, if we cannot show beyond a reasonable doubt or the state cannot show beyond a reasonable doubt that the error had no effect on the jury. And then they drew that conclusion at the end. And I see that I'm out of time. If there's no more questions, I would just ask the court to affirm the district court's decision in this case. And I don't believe... But you're just saying they used the word re-weighing, but what they actually did was harmless error review? Yes. Yes. What they did was harmless error review. It's clear they applied the Chapman Standard at the end. And again, I believe it's at page 108 of the ERs. It's the last page of their decision. Okay. Thank you, counsel. Mr. Anthony? Mr. Anthony? So there's obviously a lot to talk about with limited time. So certainly if the court has any questions about anything in particular. One thing that I would certainly want to point out, though, is that in the district court, the state took the very opposite position that they're taking today. In the district court, the state took the position that the Nevada Supreme Court engaged in re-weighing. And they also took the position that the Nevada Supreme Court was required to consider mitigation evidence proffered in the post-conviction proceeding. The court acknowledges the state's acknowledgement at EOR 19. And the state's concession was at ECF 141 at page 60. And that's where the state said that they did re-weighing and they were obligated to consider new mitigation. So I think the record needs to show what the state's position was in the district court. Secondly, I'd like to go back to the sentence of imprisonment issue. My concern there is that the state did not avail themselves of the opportunity to address this issue in the answering brief. I would argue that they waived it as a result. In my opening brief, I cited to the court the case of Parker v. State at 849 Pacific 2nd, page 1062. And Parker says that to be under a sentence of imprisonment, it's under a sentence of imprisonment for a felony. What the state is referring to is a different aggravating circumstance, which is the prior violent felony aggravating circumstance when they're talking about whether something would have been a felony if committed in the state of Nevada. So I would argue to the court that that issue is waived and the court shouldn't consider it. But at the very least, Your Honor, if the state is afforded the opportunity to file a supplemental, I would similarly make that request. Right. You can each file a letter brief up to five pages as a supplemental brief within, I would say, 10 days of this hearing. Thank you, Your Honor. So, the other issue that I wanted to discuss was I hadn't originally been able to address this issue about state law. The state cited Williams v. Taylor. Obviously, each state has their own state system. And Judge Wardlaw mentioned the very unique situation that existed before 1993 where the state of Nevada allowed two collateral attacks on the judgment. That's not something that I believe that the state has adequately addressed. And they haven't addressed our argument that it's appropriate for this court to assess the diligence of Mr. Bayerano in the proceeding where he raised the claimant issue. There are lots of states that have special proceedings for things. Proceedings for intellectual disability, proceedings for DNA testing. Out of respect for comedy and federalism, why wouldn't we look at the diligence of the petitioner in the proceeding where the claim is raised? There's no reason why we wouldn't do that. And in fact, this court's decision in pinholster expressly sanctions that approach. It says that the presentation of mental health evidence and an ineffective assistance of counsel at sentencing claim can be considered when it was proffered in connection with a second state postconviction petition. And the state's answer simply doesn't address those authorities, including the McLaughlin case, which we cited out of the state of Nevada, where this court held that the presentation of evidence in a second state postconviction proceeding was sufficient to show diligence under 2254E2. We can make even a better case for Mr. McLaughlin. So my argument is this court must look at his diligence in connection with the proceeding where he raised the claim. And it looks like my time is almost done, and I don't want to neglect if the court has any other questions for me. Does anyone else have any questions? No, I think that's it. Mr. Anthony. Thank you very much, Your Honor. All right, thank you very much. Bejarano v. Rubar will be submitted, and this session of the court is adjourned for today. All rise. This court for this session stands adjourned. Thank you.
judges: WARDLAW, RAWLINSON, NELSON